Fremont-Smith, J.
The plaintiff, Jayne Cardin, whose residence abuts the subject property on its easterly side and other residents of the neighborhood have vigorously opposed the development of this property as a five-unit townhouse from the time they learned of it in 1988. Their opposition has not been limited to contesting the development before the Zoning Board of Appeals and this Court. They have also voiced their objections (which the Court finds to have been well-founded) before the Worcester City Council, resulting in a criminal investigation of several employees of the Code Enforcement Department and an investigation by the Massachusetts Ethics Commission which resulted in findings of violations of c. 268A (the “Conflict of Interest Law”) in connection with those employees’ issuance of permits for the development.
Based upon the Court’s view of the premises and upon all of the credible evidence presented at the trial, the Court finds and concludes as follows:
*554 FINDINGS OF FACT AND RULINGS OF LAW
The plaintiff Jayne Cardin resides at 20 Fales Street, Worcester, Massachusetts, and is an abutter to the subject premises situated at 16A, 16B, 16C, 16D, 16E and 16F Fales Street (hereinafter “16 Fales Street”) Worcester, Massachusetts, and is an aggrieved party within the meaning ofM.G.L.c. 40A, Section 17. She has complied with all time limits and procedural requirements, so the matter is properly before this Court.
Edward J. Kooyomjian (hereinafter “Kooyomjian” or “the developer”) purchased the subject premises on December 24, 1986. At that time, the only structures on the lot were a single-family house numbered 142 Leeds Street and a garage which serviced that house. Kooyomjian purchased the property to construct a six-unit townhouse thereon with financing from the Intervenor, Commerce Bank & Trust Company (hereinafter “Commerce”). Commerce is the mortgagee in possession of the premises following a foreclosure sale.
Building permits issued on May 22, 1987 for the construction of the townhouse. The permits, however, violated, inter alia, the following provisions of the City of Worcester Zoning Ordinance as they apply to the RG5 zone, in which it is located:
a) Article IV, Section 3, in that, at the time of the application for building permits and their issuance, a single-family dwelling already existed on the same lot;
b) Article VI, Section 1, in that the building permits were issued without the required prior parking lot approval of the City of Worcester License Board;
c) Article V, Section 2, in that, if the developer chose to designate Fales Street as the front lot line pursuant to Article X, Section 3(h),[3] the premises violated Article V, Section 2, because the southerly side of the structure and the decks thereof were located within the 15-foot required rear yard setback, whereas, if the developer designated Leeds Street as the front lot line (as he in fact did), then the southerly side of the structure and the decks are located within the required 8-foot side yard setback.
Not only were the building permits as issued invalid because they violated at least the above provisions of the Zoning Ordinance,[4] but the building, as actually constructed, did not conform with the submitted plans and violated the Zoning and Building Ordinances in a number of additional, significant respects. For instance, the townhouse structure as built is 14.37 feet from the lot line at Fales Street (rather than the required 15-foot setback if Fales Street is the front lot line) and the townhouse structure, decks and stairs are 4.7 feet from the southerly property line (rather than the required 8 feet or 15 feet, depending on whether Fales Street or Leeds Street is the front lot).
On the same day that Use and Occupancy Permits were issued to the developer (July 11, 1988), three enforcement employees were provided with a free junket to an Atlantic City gambling casino by the developer.
After some of the circumstances surrounding the issuance of the Occupancy and Use Permits were called to the attention of the City Council by the plaintiff, the permits were revoked by order of the Code Commissioner dated October 25, 1988, citing “Deviations from dimensional requirements of the Worcester Zoning Ordinance, deviations of actual site dimensions from those submitted with permit applications, deviations in parking arrangements from that of the submitted site plan, etc.”
Approximately three months prior, the Code Commissioner had determined that it was impossible to comply with the City of Worcester parking requirements if the premises were to be considered six single-family attached dwelling units (as the original building permits contemplated) and that, if considered to be a townhouse, submission of a Parking Plan for License Board Approval should have been required prior to the issuance of the building permits. As a result, the developer, on the recommendation of the Code Commissioner, sought a variance. The Board of Appeals denied the variance, stating, inter alia, “Desirable relief may not be granted without nullifying or substantially derogating from the intent or purpose of the City of Worcester zoning ordinance. Encroachment into the sideyard setback overcrowds the land by reducing the separation between petitioner’s building and the abutting structures. Arrangement of the driveway access in violation of the ordinance increases traffic congestion on Fales Street and creates a safety hazard.”
Following the Board of Appeals’ denial of the variance and the Code Commissioner’s revocation of the Occupancy and Use Permits, Kooyomjian endeavored to bring the townhouse into compliance with the Zoning Ordinance by doing the following:
a) He sawed off approximately 2 feet of the decks and stairs situated on the south side of the property.
b) On September 22, 1988, he secured the endorsement of the Planning Board to a plan incorporating into the townhouse lot an additional 57 square feet of area. A deed of that land, however, was never recorded in the Registry of Deeds.
c) On or about March 17, 1989, the structure which is 28.4 feet wide and 102.3 feet long, was lifted off its foundation and moved 1.36 feet in a northerly direction and .78 feet in an easterly direction.
d) Pursuant to Kooyomjian’s application, the City of Worcester License Board, on September 21, 1989, approved a parking plan for ten cars upon specific conditions and issued its Open Air Parking Space License incorporating those conditions. The license *555 issued by its terms was not transferable and expired by its terms on July 31, 1990. It was not renewed on July 31, 1990, because Kooyomjian had failed to meet the conditions imposed by the license.
e) On or about March 2, 1990, Kooyomjian attempted to convert units A and B into a single unit in order to reduce the number of units in an effort to meet parking ordinance requirements. In doing so, a walkway was cut through the wall between the two units, and one kitchen stove, dishwasher, sink, and a refrigerator were removed, resulting in one unit twice as large as the remaining four units, containing four bathrooms and two kitchens.
Thereafter, Kooyomjian abandoned all construction efforts. The building permit which had issued for the relocation had required the installation of permanent structural support in accordance with the Massachusetts Building Code, but that support was never installed. As a result, the structure overhangs its foundation, causing rain water to accumulate in the cellars of the units, and the building has inadequate structural support.
Due to the lack of adequate inspections during construction, the premises also contain numerous other building code violations, including:
a) The lack of a continuous party wall fire separation from the basement to the attic between units and from the foundation to the underside of the exterior roof sheathing which would have provided a properly rated one-hour fire separation. This defect creates a serious safety hazard;
b) Multiple electrical code violations;
c) Improper insulation and weather proofing and the lack of soffit vents.
As a result of the attempted relocation of the structure and reduction in the size of decks and stairs, moreover, additional building code violations were created, including improperly constructed exterior egress stairs and interior stairs, lack of uniformity in riser height on exterior stairs at both the front and rear of the structure, improper foundation piers or footings for all exterior porches and stairs, inadequately spaced stringers and joists, inadequately-sized treads and decking on all rear stairs, and lack ofjproper anchorage of the structure to the foundation.[5] Also, units D, E and F have basement kneewalls constructed of untreated lumber which extend closer to grade than the minimum 8" clearance. The exposed foundation wall as a result of the shifting of the building on its foundation, has not been properly flashed, thus resulting in water being present in the basements of a majority of the units, including A, B, E and F. The interior stairs of each unit leading to the basement have inadequate head room, inadequate structural support, and/or because of the stair treads, are pitched towards the basement in a dangerous manner. The interior stairs connecting the first and second floors in Units D, E and F lack adequate head room. The interior stairs in Units E and F lack required dimensional uniformiiy and riser height.
The use of the third-floor attic rooms in each of the units as a sleeping room is improper due to inadequate lighting, lack of electrical outlets, and, most significantly, lack of emergency egress window or door required in all third-story sleeping rooms as a safeguard in case of fire.
All building code violations remain and have become exacerbated over the years. The Court’s view of the premises indicated that the structure is visibly decaying in some areas as a result of those violations.
On November 17,1988, the City of Worcester Police Department Internal Affairs Division began an investigation of the circumstances surrounding the issuance of the Occupancy and Use permits for the townhouse, as a result of a City Council order to the City Manager. The investigation concluded that there was no evidence of a final inspection having ever been done on the plumbing at the townhouse,[6] that the original building permit job site card with the necessary signatures of individual inspectors had been destroyed as soon as the occupancy and use permit was issued, and that the water service to the townhouse had not even been installed and the water supply turned on until July 22, 1988, eleven days following the issuance of the Occupancy and Use Permits.
Despite the existence of the above-described zoning violations and of the numerous safety-related building code violations, and despite the revocation of the Occupancy and Use Permits in July 1988, the structure remains occupied by tenants and Commerce Bank & Trust Company continues to collect rent from the tenants. In spite of orders by the City to do so, the bank has corrected none of the building code violations and has taken no steps to evict the tenants (except one attempted eviction for non-payment of rent). From time to time, individuals continue to occupy the attic rooms, in violation of the Massachusetts Building Code and at significant safety risk to the occupants should a fire occur.
On November 15, 1988 and on April 2, 1991 the Zoning Ordinance was amended in ways which all parties conceded at trial make it impossible for the existing structure to be brought into conformity. If the amended ordinance governs, there is thus no possible way for the structure to be modified so as to be put to any legal use.
The City and Commerce contend, however, that it is feasible to bring the structure into compliance with the 1980 Zoning Code, which they contend is the applicable Zoning Code, and with all Building Code requirements. The Court, however, is not convinced. Commerce’s expert testified that, if brought into conformity, the five units could be sold for about $75,000 *556 per unit, or $375,000, but would need up to $165,000 of structural repairs. This, however, would require a further movement of the entire structure, which plaintiffs expert testified would be likely to cause further structural stress to the previously-moved building which could well compromise the safely of the structure. As a result of the Court’s view of the dilapidated condition of most parts of the premises, the Court agrees with plaintiffs expert that any attempted further movement of, and substantial structural alterations to, the existing structure cannot be feasibly accomplished.
Even were such modifications feasible, moreover, they would be in any event futile because they would not result in compliance with the current amended Zoning Code, which the Court rules is the applicable Code.
Although they concede that the existing structure cannot be modified so that it could be legally used under the amended Zoning Code, Commerce and the City contend that compliance with the amended Code is not required because “an amended building permit” can be issued which would be retroactive, i.e. would “relate back” to the date of the original permits, and thus be “grandfathered” under c. 40A, §6. Thus, in Carstensen v. Zoning Board of Cambridge, 11 Mass.App.Ct. 348, 356 (1981), the court held that “a zoning board or superintendent of buildings may [retroactively] modify a permit if the builder ‘demonstrates a good faith effort to comply with the applicable law’ and the defects are remediable.” See also Smith v. Building Commissioner of Brookline, 367 Mass. 765, 773, n. 9.
Here, however, not only are the defects not remediable, but the record does not demonstrate “a good faith effort to comply with the applicable law.” On the contrary, the history of this development evinces an effort to disregard or circumvent numerous provisions of the Zoning and Building codes, including a resort to illegal influence brought to bear upon the employees responsible for inspecting the premises and for issuance of the various permits. Under these circumstances, the existing, invalid building permits cannot be retroactively amended so as to avoid the provisions of the current, amended ordinance. Carstensen, supra; Smith, supra.
The townhouse, moreover, continues to adversely affect the neighborhood in the ways found by the Zoning Board of Appeals when it denied a variance, i.e. lack of adequate parking requiring motor vehicles to back into Fales Street with resultant danger to persons and property, increased congestion and noise resulting from proximity of the structure to the surrounding homes, increased danger caused by inadequate means of access to the premises for fire trucks due to its proximity to surrounding residences and the parking of cars in front of the structure and lack of adequate supervision and maintenance by the landlord causing the accumulation of rubbish and junk in the back yard, and uncut grass and weeds observed in the front.
In these circumstances, where the builder and bank in possession have undertaken no good faith efforts to comply with the law and where conformity with the existing law for any contemplated legal use is impossible, this Court is empowered to order the demolition and removal of the offending structure. See Inspector of Buildings of Burlington v. Murphy, 320 Mass. 207 (1946); Board of Selectmen of Blackstone v. Tellestone, 4 Mass.App.Ct. 311, 316 (1976); Seekonk v. Anthony, 339 Mass. 49, 55 (1959); Manchester v. Phillips, 343 Mass. 591, 597 (1962); Brewster v. Sherman, 343 Mass. 598, 599, 560 (1962); Bridgewater v. Chuckran, 351 Mass. 20, 24 (1966); and Building Inspector of Falmouth v. Nick Haddad, 3 Mass.App.Ct. 114, 121-22, (1975).
JUDGMENT
For the foregoing reasons, judgment is entered in favor of the plaintiff. Commerce Bank & Trust Company is ordered to demolish and remove the building located at 16 Fales Street, Worcester, Massachusetts, said demolition and removal to be completed within sixty days of receipt of this Order. The City of Worcester is ordered to take all necessary legal steps to enable Commerce Bank & Trust Company to carry out said demolition and removal.

 Article X, Section 3(h) permits the owner of a corner lot to designate either street lot line as the front lot line.

 If the Ordinance is literally construed, and Leeds Street is designated the front lot (as Kooyomjian did), the building was also within the approximately 23-foot set-back required by Article X, Section 2(g).

 As a result of the pivotal movement of the building, there is no continuous foundation support and the support installed consists of untreated wooden posts on bare ground without any concrete footings. The south side of the building and roof are inadequately supported in units D, E and F by 2" x 6" wood stud walls with a 2" x 4" sill plate. The westerly foundation is inadequately supported by a 2" x 4” wood stud wall in the basement. Plaintiffs architect opined that the building could be torn from its foundations in a hurricane or similar storm.

 The Plumbing Inspector had no records and reported that “Someone stole my notebook.” He said he had performed the final plumbing inspection before water had been connected to the premises, by running a line from the property next door.